# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Kevin A. Avery and Denise M. Avery, a/k/a Denise W. Murdock, as assignees of the Estate of Andrzej Furmanski, Deceased,<br><br>        Plaintiffs,<br><br>vs.<br><br>Lahr Agency, LLC, n/k/a REL Agency, LLC,<br><br>        Defendant. | **ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND TO DETERMINE SCOPE OF DAMAGES**<br><br>Case No. 1:17-cv-265 |

## I. BACKGROUND

In October 2012, Avery Enterprises, Inc. ("Avery Enterprises") purchased a Beechcraft E35 Bonanza aircraft. Avery Enterprises is an oilfield services company doing work in North Dakota's oilfields that is owned by plaintiff Kevin Avery ("Avery").

Plaintiffs contend that, within several days of acquiring ownership of the aircraft, Avery contacted his insurance broker, Richard Lahr ("Lahr"), to let him know of the purchase and that he wanted insurance on the aircraft. At that time, Lahr was a principal of defendant Lahr Agency, LLC, and a personal friend of Avery. He is now deceased.

When Avery first contacted Lahr about insuring the aircraft, he told Lahr there was no particular hurry because the aircraft needed to be certified and this was not going to be done until the following spring. According to Avery, Lahr responded with words to the effect: "Don't worry about it. I'll take care of it." According to plaintiffs, this conversation took place over a speakerphone. Mrs. Avery, who was listening, recalls Lahr stating: "Don't worry about it. I've got

1

it taken care of."

In March or April of 2013, the aircraft needed to be flown to Mandan, North Dakota for the FAA certification. Avery states he contacted Lahr in advance of the flight to confirm insurance coverage. Lahr purportedly assured him by stating "Don't worry about it. I will take care of it."

At some point, Avery provided Lahr with a serial number or tail number of the aircraft as well as the background of Andrzej Furmanski ("Furmanski"), whom Avery hired as an employee of Avery Enterprises to pilot the aircraft. Also, while the aircraft was hangared in Mandan following the inspection, Lahr went to the hanger and photographed it.

According to plaintiffs, Avery again called Lahr from a pickup in April or May 2013 about the status of insurance on the aircraft while Avery, Mrs. Avery, and Avery's cousin, Jeff Avery, were en route to the airport to fly the plane to Cheyenne, Wyoming. Avery states he initiated the call because he had not yet seen any insurance information and the plane was going to be flown that day. According to Avery, Lahr responded not to worry about it and that he had taken care of it. Mrs. Avery and Jeff Avery overheard the conversation, which was on speaker. Mrs. Avery's recollection of the conversation mirrored that of her husband. Jeff Avery's recollection was similar and he recounted: "During the conversation, Mr. Avery asked Mr. Lahr if the plane was insured. Mr. Lahr told him it was taken care of and the plane had insurance coverage."

Avery acknowledges that he did not know the amount of liability insurance coverage that Lahr would have procured because he left that up to Lahr's good judgment. Lahr, who was a personal friend of Avery, took care of all of the insurance needs for Avery Enterprises and for Avery personally and Avery similarly relied upon Lahr to determine what coverages, including amounts, were appropriate. According to Avery, the yearly premium for the total package of insurance

2

coverages was over $400,000. Avery states he could not immediately discern from his insurance billings whether the aircraft had been insured or not because the monthly premium billing for all coverages was in one large lump sum.

On August 12, 2013, Avery used the aircraft to travel for business purposes from his home in Idaho with an intended destination of Tioga, North Dakota. En route, the aircraft crashed in West Yellowstone, Montana. Furmanski, who was piloting the aircraft, perished. Avery survived the crash but suffered devastating injuries.

On March 14, 2016, plaintiffs commenced an action in this court against the Furmanski Estate for negligence on the part of Furmanski in piloting the aircraft at the time of the crash. While the Estate appeared in the action, it did not actively assert any defenses it may have had to liability nor did it contest the evidence of fault and damages presented to the court in a less than one-day bench trial on September 8, 2017.

On November 15, 2017, the court entered an amended judgment against the Furmanski Estate. Based on the uncontested evidence presented, the court awarded plaintiffs $7,273,069 ($6,473,069 for Mr. Avery and $800,000 for Mrs. Avery on her consortium claim).

Subsequent to the entry of judgment, the Furmanski Estate assigned any claims it might have against the defendant for failing to secure coverage on the aircraft and for making false statements relating to the procurement of insurance in exchange for an agreement on the part of plaintiffs not to execute upon the judgment against the Estate. On December 13, 2017, plaintiffs initiated this action against the defendant asserting only the claims obtained from the Furmanski Estate by way of assignment.

As to the assigned claims, there is no evidence of any communication between Lahr and

3

Furmanski personally. Lahr died on October 7, 2016, prior to the commencement of this action. The only named defendant is the insurance agency of which Lahr was a principal.

## II. DISCUSSION

### A. Introduction

Before the court for consideration now are two motions. The first is defendant's motion for summary judgment, which is limited in scope. Upon reviewing the briefs on this motion along with other filings because trial was soon approaching, the court held a conference call with the parties to discuss issues that likely will arise at trial with respect to liability and damages that were not the subject of defendant's motion for summary judgment. This resulted in the court postponing the trial and plaintiffs filing the other motion now pending in which they ask the court to rule in advance of trial on the scope of recoverable damages.

Before turning to the pending motions, it helpful for purposes of what follows to discuss generally the claims being asserted by plaintiffs as well as the damages they are claiming.

The complaint in this case alleges claims of negligence and deceit. The facts pled in the complaint with respect to the negligence claim essentially are that Lahr negligently failed to secure insurance on the aircraft on behalf of Avery Enterprises as requested by Avery. Since the claim being asserted is one purportedly belonging originally to Furmanski, the complaint goes on to allege that Lahr's duty to obtain coverage extended to Furmanski as an employee of Avery Enterprises.

The focus of plaintiffs' deceit claim are the assurances allegedly given by Lahr to Avery that he (Lahr) would secure coverage and later that he had taken care of it. Under North Dakota law, a claim for deceit is statutory. N.D.C.C. § 9-10-03 provides that: "One who willfully deceives another with intent to induce that person to alter that person's position to that person's injury or risk is liable

for any damage which that person thereby suffers." Section 9-10-02 makes actionable as deceit several different kinds of deceptive conduct. It reads as follows:

**§ 9-10-02. Deceit--Definition**

A deceit within the meaning of section 9-10-03 is:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4. A promise made without any intention of performing.

Plaintiffs do not contend in their complaint that Lahr personally assured Furmanski he would secure or had secured insurance coverage. While not entirely clear, it appears plaintiffs have two theories for why that is not required in order to sustain their deceit claim. One is that all that matters is that (1) Lahr tortiously gave false and deceptive assurances to Avery, and (2) this set in motion a series of events resulting in damages to the Furmanski Estate. In other words, this theory of liability appears to be that:

- Lahr assured Kevin Avery the aircraft was insured when, in fact, it was not.

- The aircraft would not have flown on the day of the accident but for Lahr's false assurances the aircraft was insured since Kevin Avery would not have permitted the aircraft to be flown if he had known it was not insured.

- If the aircraft had not flown, Furmanski would not have committed pilot error causing the plane to crash and subjecting the Furmanski Estate to the judgment that was entered by this court.

The other theory appears to be that it was foreseeable to Lahr that the assurances he gave Avery

would be relied upon by Avery Enterprises and its employees, particularly Furmanski, who was hired to be the aircraft's pilot.

As for damages, plaintiffs claim the amount has already been determined. That is, defendant is liable for the $7,273,069 plus interest judgment entered in the action brought by plaintiffs against the Furmanski Estate.

Defendant disputes both liability and damages. With respect to the latter, defendant claims not only that it is not bound by the prior judgment but also that the recoverable damages, if any, would be limited to the amount of coverage that would have been available had Lahr secured insurance on the aircraft for Avery Enterprises as requested by Avery.

During the conference with the parties, the court, among other things, expressed skepticism with respect to plaintiffs' theory of damages. The attorney for plaintiffs indicated that how the court rules on the scope of damages will have a huge impact on the case—both in terms of the evidence that would need to be presented at trial as well as the size of any recovery—and that it would be beneficial for both parties to know in advance of trial how the court will rule. This was the reason for plaintiffs filing their motion seeking a ruling on the scope of damages.

### B. Defendant's motion for summary judgment

#### 1. The negligence claim

The only argument made by defendant in its motion for summary judgment with respect to the claim of negligent procurement of insurance is that it is untimely.

North Dakota has a two-year statute of limitations for claims of negligence against licensed insurance producers. Specifically, N.D.C.C. § 26.1-26-51 provides:

> A civil action for the recovery of damages resulting from negligence or breach of contract brought against any person licensed under this chapter by any person claiming to have been

6

> injured as a result of the providing of insurance services or the failure to provide insurance services by a licensee may not be commenced in this state after July 31, 1995, unless the action is commenced on or before the earlier of:
>
> > 1. Two years from the date the alleged act, omission, or neglect is discovered or should have been discovered by the exercise of reasonable diligence; or
> >
> > 2. Six years after performance of the service for which the claim for relief arises, unless discovery was prevented by the fraudulent conduct of the licensee.

See also Overboe v. Farm Credit Services of Fargo, 2001 ND 58, 623 N.W.2d 372 (two-year statute of limitations applies to licensed insurance agents). And, in this case, both defendant and its then principal Richard Lahr were licensed insurance providers in the State of North Dakota.[1]

Defendant argues that the claim of negligent failure to procure insurance is barred by the two-year statute of limitations based upon undisputable evidence that plaintiffs were aware the aircraft was not insured at least by August 2013. The problem for this argument is that the claims being sued upon are those acquired from the Furmanski Estate.

Plaintiffs have offered affidavit testimony which supports a finding that neither Mrs. Furmanski nor the Estate were aware that a claim of pilot error was going to be asserted against the Estate by the plaintiffs until sometime early in 2016 and that they were otherwise unaware of the lack of insurance on the aircraft prior to that point. Defendant has not presented contrary evidence as to Mrs. Furmanski's or the Estate's actual knowledge. Further, in terms of whether they should have known, the circumstances are such that a reasonable juror could conclude that, even with exercise of reasonable diligence, Mrs. Furmanski and the Estate would not necessarily have acquired the requisite knowledge. Hence, there is at least a fact issue with respect to whether the statute of limitations has run on the negligence claim of the Furmanski Estate assigned to plaintiffs.

---

[1] Defendant is considered a person under the two-year statute of limitations in that Chapter 26.1-26 defines "Person" as "an individual or a business entity". See N.D.C.C. § 26.1-26-02(9).

### 2. The deceit claim

Defendant makes several arguments for why there is insufficient evidence to support a claim for deceit. One is that the evidence is insufficient to support the conclusion that, when Lahr allegedly assured Kevin Avery he would take care of insuring the aircraft, he intended not to and that any subsequent failure to follow through on this part was only negligence. Defendant ignores, however, the evidence that Lahr went beyond his initial assurances that he would take of insuring the aircraft and stated it had been take care of. Also, there is the deposition testimony of Lahr's spouse that, prior to his death, Lahr remarked to her that he never would have insured the aircraft. Further, even putting this evidence aside, the court is not now prepared to say that no reasonable juror could conclude that Lahr's repeated assurances he would take care of insuring the aircraft could not at some point themselves rise to the level of deceit.

Another argument made by defendant is that there no evidence that Lahr obtained or gave up anything when he purportedly assured Avery he would take care of insuring the aircraft. Defendant argues Lahr was in the business of selling insurance, so failing to insure the aircraft and thereby not earning a commission was to his detriment. The problem with this argument is that a benefit to the deceiver is not an essential element for a claim of deceit under North Dakota law. See N.D.C.C. §§ 9-10-02 (defining deceit) & 9-10-03 (damages for deceit); see also NDJI C-8.00 (North Dakota pattern instruction defining deceit). Further, even if it was a necessary element, reasonable jurors could conclude the benefit Lahr was protecting in making his alleged false statements was his large book of insurance on Avery Enterprises's operations, which potentially was subject to risk if Avery concluded Lahr was not being diligent in handling his insurance needs.

The final argument defendant makes is that plaintiffs have no evidence that Lahr made the

8

purported statements with "the intent to induce Kevin Avery to fly without insurance." To the extent this is material, North Dakota's deceit law as referenced above would not require this specific intent.

### C. Plaintiffs' motion to determine the scope of recoverable damages

#### 1. Whether recoverable damages are limited to the insurance coverage that would have been procured

Defendant argues that the recoverable damages would be limited to the amount of liability insurance coverage that would have been available if Lahr had secured coverage on the aircraft. Defendant further intimates the amount might be zero if it is demonstrated that the policy Lahr likely would have procured would have excluded coverage altogether for a claim by plaintiffs for negligence on the part of an employee.

Defendant argues it stands to reason that damages would be limited to the insurance coverage that would have been available given the nature of the claims being asserted and that, in any event, this limitation is compelled by N.D.C.C. § 32-03-36, which reads:

> **§ 32-03-36. Recovery not more than gained by performance**
>
> Notwithstanding the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation than the person could have gained by the full performance thereof on both sides, except in the cases wherein exemplary damages or penal damages are authorized, and in the case specified in section 36-21-13.

The court agrees with defendant. While the North Dakota Supreme Court does not appear to have decided a case directly on point with respect to the circumstances of this case, there is no reason to believe it would not follow what most courts have held to be the measure of damages when the necessary focus (here dictated by statue) is what would have obtained had full performance of the obligation (in this case procurement of insurance) been fulfilled. That is, what an insurer would have had to pay, if anything. See, e.g., Prince v. Royal Indem. Co., 541 F.2d 646, 650 (7th Cir.1976)

9

(whether an action against an insurance broker sounds in contract or tort for failure to procure insurance coverage "Illinois courts have consistently held that the broker's liability covers the full extent of the loss, up to the limits of the policy the broker agreed to procure"); Kobbeman v. Oleson, 574 N.W.2d 633, 635 (S.D.1998) ("Kobbeman") (the appropriate measure of damages upon the breach of an insurance agent's duty to obtain insurance "is the amount the insurer would have paid on behalf of the insured had the desired coverage been obtained[,]" citing numerous cases); see also 3 Couch on Insurance § 46:74 (3rd ed. June 2019 update) ("The proper measure of damages in an action against an agent for failure to procure insurance is the amount that would have been due under the policy if it had been obtained, plus any consequential damages resulting from the agent's breach of duty, and punitive damages when the agent acted fraudulently and with actual malice or reckless disregard.") (footnotes omitted); 43 Am. Jur. 2d Insurance § 150 (May 2019 update).

Plaintiffs argue that § 32-03-36 is limited to actions based upon a contract and does not apply to tort actions. However, the text of the statute clearly indicates the contrary. If the section only applied to contract claims, there would been have no reason for it to refer to exemplary or penal damages since they are not recoverable on claims for breach of contract. N.D.C.C. §§ 32-03-09 (measure of damages for breach of contract with no provision for punitive damages), 32-03-35 (damages prescribed by ch. 32-03 exclude exemplary damages unless provided for otherwise), 32-03.2-11 (stating, in part, that punitive damages may be awarded on claims not arising out of contract when the defendant has been guilty of oppression, fraud, or malice (actual or presumed) and replacing now repealed § 32-03-07 that stated the same thing); see also Continental Resources, Inc. v. P&P Industries, LLC I, 2018 ND 11, ¶¶ 49–57, 906 N.W.2d 105 (punitive damages not recoverable for claims based only upon breach of contract). The same is true for § 32-03-36's

10

reference to § 36-21-13, which provides that exemplary damages may be recovered for a wrongful injury to an animal committed willfully or by gross negligence. Also, there is nothing in § 32-03-36's placement in ch. 32-03 that suggests it is limited only to claims based on contract. Chapter 32-03 addresses recoverable damages generally and contains provisions that apply only to claims for breach of contract, only to tort claims, or to all claims of liability no matter what the theory.

Finally, and dispositive here, is that the North Dakota Supreme Court held in Beare v. Wright, 103 N.W. 632 (N.D. 1905) that § 32-03-36 applied to a claim for deceit.[2] 103 N.W. 632, 636–37 (N.D. 1905) (citing to predecessor statute). And relying upon Beare, it has held that damages for claim for deceit are limited to that which is which is proximately caused by the specific misrepresentation or nondisclosure. See, e.g., Schneider v. Schaaf, 1999 ND 235, ¶ 18, 603 N.W.2d 869.

### 2. Whether defendant is bound by the judgment entered against the Furmanski Estate

Defendant also argues that it is not bound by the judgment that was entered against the Furmanski Estate since it was not a party. The court again agrees.

First, applying general principles of issue preclusion under North Dakota law, defendant would not be bound by what was decided in the action brought by plaintiffs against the Furmanski Estate, including the judgment, since defendant was neither a party to that action nor in privity with

---

[2] Even in the absence of § 32-03-36, the North Dakota Supreme Court would likely have concluded that damages would be limited to the amount of insurance coverage that would have been available based on application of general principles of duty (*i.e.*, the duty being limited in terms of the claim for negligence) and proximate cause (*i.e.,* the damages being recoverable for false assurances of coverage would be limited to the coverage that would have been obtained). See, e.g., 3 Couch on Insurance § 46:74 Modern Tort Law: Liability and Lirtigation, §§ 3:17, 4:7 (2d ed. June 2019 update).

the Furmanski Estate. See, e.g., Hofsommer v. Hofsommer Excavating, Inc., 488 N.W.2d 383–84 (N.D. 1992) (setting forth the necessary elements for application of claim and issue preclusion under North Dakota law).  Plaintiffs have failed to cite any authority for why these general principles are not applicable under the circumstances presented by this case.

Second, the North Dakota Supreme Court in Wangler v. Lerol, 2003 ND 164, 670 N.W.2d 830 concluded under somewhat analogous circumstances that the defendant insurance agent in that case was not bound by a judgment entered against the person claiming to have been insured pursuant to what is often referred to in North Dakota as a Miller-Shugart settlement.[3]  The facts of that case were the following:  Wangler suffered injuries while he was working for Pine Ridge Company ("Pine Ridge"), a company engaged in turkey farming.  Wangler sued Pine Ridge, which, according to the court's opinion, did not carry workers compensation insurance.[4]  Pine Ridge submitted Wangler's personal injury claim to its liability insurer, Farmers Union Mutual Insurance Company ("Farmers Union"), through Ron Lerol ("Lerol"), the insurance agent who sold the liability insurance policy.  Although the liability policy included coverage for employee liability claims, only Pine Ridge's two owners were named insureds.  After Farmers Union denied Pine Ridge coverage, Pine Ridge instituted an action against Lerol and Farmers Union to recover any damages it might have to pay as result of Wangler's personal injury action.  2003 ND 164, ¶¶ 1–4.

---

[3] Named after the Minnesota Supreme Court's decision in Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982). See, e.g., Wangler, 2003 ND 164, ¶ 21.

[4] Most likely, this was offered to explain why Wangler was able to sue his employer for his personal injuries. If there was coverage, North Dakota law would have prohibited Wangler from suing his employer or his co-employees for personal injury suffered during the course of employment. See Barsness v. General Diesel & Equip. Co., 422 N.W.2d 810, 822 (N.D. 1988); N.D.C.C. §§ 65-01-01, 65-01-08(1), 65-04-28.  The opinion is silent as to why there was no workers compensation coverage in instance, but it may be that Pine Ridge qualified for the "agricultural exemption" set forth in N.D.C.C. § 65-01-02(20)(a) to what otherwise is mandatory coverage for most employers.

12

Pine Ridge asserted in its action claims for insurance coverage by estoppel and negligent misrepresentation based on statements allegedly made by Lerol that the two owners claimed led them to believe Pine Ridge possessed the requisite insurance coverage. Pine Ridge claimed Farmers Union was liable for Lerol's tortious conduct based upon the doctrine of respondeat superior. While that action was pending, Wangler and Pine Ridge entered into a Miller-Shugart settlement pursuant to which: (1) the parties stipulated to the entry of judgment against Pine Ridge in the amount of $200,000 and (2) Pine Ridge assigned its negligence claims against Lerol and Farmers Union in exchange for Wangler's agreement not to seek recovery on its judgment from Pine Ridge by executing on its assets. Id. at ¶¶ 5–6..

The district court in Wangler dismissed both the estoppel and negligent misrepresentation claims. On appeal, the North Dakota Supreme Court concluded that, even if coverage could be established by estoppel, the statements made by Lerol were too ambiguous to be a basis for estoppel and upheld the dismissal of the claim for that reason. With respect to the negligent misrepresentation claim, however, the North Dakota Supreme Court reversed the district court, which had concluded that Pine Ridge had released any claims it might have against Lerol and Farmers Union in the settlement agreement it entered into with Wangler. The North Dakota Supreme Court concluded that the covenant not execute in the settlement agreement did not constitute a release and thereby did not extinguish Pine Ridge's damages. The court remanded the case to the district court for trial on the negligent misrepresentation claim. Id. at ¶¶ 7–23.

Relevant now is what the North Dakota Supreme Court held in remanding the case about whether Lerol was bound by the Miller-Shugart settlement agreement. In concluding Lerol was not bound and that Wangler would have to prove both liability and damages as to Lerol, the court stated:

13

> Although the Miller–Shugart agreement did not eliminate the fact of damages, the agreement itself is of no relevance to Wangler's negligence action against Lerol. In St. Michel v. Burns and Wilcox, Ltd., 433 N.W.2d 130 (Minn.App.1988), the Minnesota Court of Appeals ruled a Miller–Shugart agreement between the injured plaintiff and an insured could not be enforced against insurance agents. The court noted that in a typical Miller–Shugart agreement, the rights and obligations between the insured and insurer are grounded on an insurance policy contract, and reasoned:
>
>> We agree with appellants that their situation is different from the circumstances in Miller. The agent's situation is not like the existing contractual relationship between an insured and insurer. The insurer's responsibilities under the contract exist at the time the claim arises between the plaintiff and the insured, but the agent's obligation to indemnify . . . arises only after . . . the agent's substitute liability is confirmed by agreement or litigation. During the interim, there is an inadequate relationship to justify the risk and eventual burden of a settlement.
>>
>> It is evident that in Miller the supreme court undertook a delicate balancing of burdens and risks and resolved them against the interest of an insurer. Different questions are involved in applying the same rule of law to a case which does not involve existing contractual responsibilities between an insured and insurer, and Miller does not support this application.
>
> Id. at 135. Consequently, the settlement agreement is not probative on the issues of Lerol's fault or Pine Ridge's damages. See Campione, 661 N.E.2d at 663. Wangler, as the assignee, will have to prove his negligence action against Lerol in full. See Kobbeman, 574 N.W.2d at 636–37.

Id. at ¶ 23.

Given what the North Dakota Supreme Court concluded in Wangler about the differences between the agent in that case and an insurer as well as the cases it cited,[5] there is no reason to

---

[5] The portion of the South Dakota Supreme Court's opinion in Kobbeman cited by Wangler reads: After considering the gamut of decisions in response to these arrangements, we find ourselves in agreement with those courts upholding assignments of a cause of action in exchange for a covenant not to execute in instances of failure to procure requested insurance. Red Giant Oil Co. v. Lawlor, 528 N.W.2d 524 (Iowa 1995). Concerns that such agreements are intrinsically collusive will not control because insurers have available to them a panoply of defenses, including coverage, fraud, and collusion. Id. at 533. "We fail to see why legally it should make any difference who sues the insurer—the insured or the insured's assignee." Id. Indeed, the assignee "would have to prove his damages and the insurer would have a right to assert any defense that it might have had if the insurance had been purchased as requested." Freeman, 755 F.2d at 141 (Heaney, C.J., dissenting). Requiring assignees to prove their case "in full reduces the risk of collusion, and justifies giving effect to the assignment of the negligence claims." Campione v. Wilson, 422 Mass. 185, 661 N.E.2d 658, 663 (1996).
574 N.W.2d at 636–37. In Campione (another case involving claims for failing to secure insurance coverage that were assigned in exchange for a covenant not to sue), the Massachusetts high court stated the following in the portion of the

14

believe it would conclude that defendant in this case would be bound by the judgment entered against the Furmanski Estate and plaintiffs not required to prove damages—particularly here given defendant was not put on notice of the suit against the Furmanski Estate and afforded the opportunity to defend.[6]

---

opinion cited by Wangler:
> We do not ignore the risk that, when a prejudgment settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor. See Glenn v. Fleming, 247 Kan. 296, 318, 799 P.2d 79 (1990) (expressing "concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties"). However, the risk of collusion in this case appears minimal in view of the seriousness of the accident, the existence of liability, and the probability that a fact finder will find that damages exceeded any existing insurance coverage. As did the court in the Glenn case, we think any risk of collusion can be diminished by requiring the plaintiffs to assume the burden of proof with respect to the claims brought by them, see id. at 318–319, 799 P.2d 79, citing Griggs v. Bertram, 88 N.J. 347, 367–368, 443 A.2d 163 (1982), and by recognizing that, unlike an insurance company which has failed to defend its insured, these defendants, who were not parties to the settlement agreement, cannot be bound by its terms insofar as it purports to fix their liability. See Home Indem. Ins. Co. v. Merchants Distribs., Inc., 396 Mass. 103, 104, 106–107, 483 N.E.2d 1099 (1985) (insurer's settlement agreement which imposes costs on insured is not binding on insured who is not party to agreement and has not had opportunity to litigate disputed point). Further, it is open to the defendants to suggest the issue of collusion, and if a satisfactory basis exists, to argue it to the fact finder.
>
> To recover against the defendants, therefore, in addition to proving the essential elements of their negligence claim against them, the plaintiffs will have to establish O'Donnell's fault for accident (at least because the question of comparative fault may be in dispute and may affect the measure of damages), and they must prove the extent to which their damages exceeded the coverage afforded by American. We do not consider the settlement agreement as probative on any of these points, particularly damages. See Steil v. Florida Physicians' Ins. Reciprocal, 448 So.2d 589, 592 (Fla.Dist.Ct.App.1984). Placing with the plaintiffs the responsibility of proving their assigned claims in full reduces the risk of collusion, and justifies giving effect to the assignment of the negligence claims. We conclude that the plaintiffs' negligence claims should not have been dismissed.

Campione v. Wilson, 661 N.E.2d 658, 663 (Mass. Sup. Jud. Ct. 1996).

[6] Granted, there are differences between the judgment entered pursuant to the Miller-Shugart agreement in Wangler and the judgement entered against the Furmanski Estate. In Wangler, the amount of the judgment was the product of a stipulation that likely reflected what Wangler's attorneys believed could be proved on their best day (or, perhaps, slightly above), keeping in mind that later the reasonableness of the settlement amount may have to be proved. With respect to the judgment against the Furmanski Estate, while a hopefully neutral judge found fault on the part of Furmanski and made findings as to the amounts of damages suffered by the plaintiffs, the proceeding was one-sided. The Furmanski Estate did not assert potential defenses to liability nor did it contest the evidence that was presented with respect to fault and damages. Further, as noted above, defendant was not given notice of the proceeding against the Furmanski Estate and afforded the opportunity to defend. But, even if the court is wrong in determining that the North Dakota Supreme Court would apply the general rules of claim and issue preclusion and conclude defendant is not bound by the judgment entered against the Furmanski Estate, the North Dakota Supreme Court at most would conclude the judgment to be only presumptive of liability and damages and that defendant could challenge its reasonableness as to

### III. CONCLUSIONS AND ORDER

Based on the foregoing, the court **CONCLUDES** and **ORDERS** as follows:

1. Defendant's motion for summary judgment (Doc. No. 14) is **DENIED**.

2. With respect to plaintiffs' motion requesting a ruling on the scope of damages in advance of trial (Doc. No. 37), the court rules:

    a. Defendant is not bound by the judgment entered against the Furmanski Estate;

    b. Damages would be limited to the insurance coverage that would have been available to Furmanski, if any, under a policy plaintiffs are able to persuade the jury defendant would have procured.[7]

Dated this 7th day of August, 2019.

                                              */s/ Charles S. Miller, Jr.*
                                              Charles S. Miller, Jr., Magistrate Judge
                                              United States District Court

---

both.

[7] In response to plaintiffs' motion to determine the scope of damages, defendant argues that: (1) the essence of plaintiffs' damage claim is that Avery detrimentally relied upon the upon the representations made by Lahr; (2) this court has previously ruled that detrimental reliance is not separate cause of action but merely an element of estoppel, which is not applicable in this case, and (3) plaintiffs have not pled in their complaint a cause of action for either detrimental reliance or estoppel. These arguments go beyond plaintiffs' motion, which was limited to seeking a ruling on the scope of damages. But, even putting that aside, the arguments lack merit. The substantive points made by defendant have not precluded claims for failure to procure insurance in North Dakota. See, e.g., Wangler, 2003 ND 164; Rued Ins. Co v. Blackburn, Nickels & Smith, 543 N.W.2d 770 (N.D. 1996). Also, in determining what claims are at play based on the complaint, what is more important are the facts that have been pled than legal theories or conclusions. See, e.g., Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 848–49 (8th Cir. 2014). And here, putting aside whether plaintiffs' claims have merit or not, defendant has been provided sufficient notice of the essence of what is being claimed.